MOORE, Judge.
Joseph Edward McCarron III (“the husband”) appeals from a judgment divorcing him from Jerry Ann McCarron (“the wife”) to the extent that it divided the parties’ property, awarded the wife alimony, and ordered the husband to pay the wife’s attorney’s fees. We affirm in part and reverse in part.

Procedural History

On July 2, 2012, the wife filed a complaint seeking a divorce from the husband. On August 14, 2012, the husband filed an answer and a counterclaim seeking a divorce. On September 4, 2012, the wife answered the husband’s counterclaim. After a trial, the trial court entered a judgment on November 25, 2013, divorcing the parties on the ground of the husband’s adultery, dividing the parties’ marital property, and awarding the wife periodic alimony. On December 23, 2013, the husband filed a postjudgment motion. On February 6, 2014, the trial court amended its judgment. On February 17, 2014, the wife filed a postjudgment motion. On February 19, 2014, the trial court entered an order on the wife’s postjudgment motion. On March 18, 2014, the husband filed his notice of appeal.[1]

*73
Analysis

I. Property Division and Alimony
On appeal, the husband complains primarily that the trial court erred in its property division and its award of periodic alimony to the wife. The issues of property division and alimony are interrelated, and they must be considered together. Albertson v. Albertson, 678 So.2d 118, 120 (Ala.Civ.App.1995). First, we will consider the issues raised by the husband relating to the property division and periodic alimony that do not require joint treatment. We will then address the issues raised by the husband regarding his ability to pay the property settlement and periodic alimony awarded by the trial court.
A. Property Classification
Before making a property division, a trial court must first ascertain what property and debt belongs in the marital estate. See Ala.Code 1975, § 30-2-51(a). In this case, the trial court included the following real estate owned jointly by the parties: the marital home (“the Orange Beach house”), a condominium (“the Fair-hope condo”), and a house occupied by the wife (“the Fairhope house”). As for personal property, the trial court included the following in the marital estate: the husband’s 49% ownership interest in a closely held family corporation, McCarron Insurance Group (“MIG”); a joint checking account; household furniture; and a boat. The trial court included as marital debt, among other things, the mortgages associated with the real property and the wife’s credit-card balances.
The husband argues that the trial court erred in including the Orange Beach house in the marital estate because, he says, it had been his grandparents’ house and had been acquired toward the end of the parties’ marriage. We note, however, that, although the husband had apparently inherited a one-fifth interest in the house, he had subsequently purchased the remaining four-fifths interest of his siblings during the marriage with marital funds. Also during the marriage, the wife had helped maintain the house, the parties had refinanced the mortgage on the house and had borrowed approximately $87,000 to add on to the house, and the parties had lived there together for almost 10 years. Under those circumstances, we conclude that the trial court properly considered the Orange Beach house as a marital asset. See, e.g., Nichols v. Nichols, 824 So.2d 797, 802-03 (Ala.Civ.App.2001) (discussing the difference between marital estates and separate estates and noting that property purchased during the marriage with marital funds is marital property); see also Ala.Code 1975, § 30-2-51(a) (allowing trial court to consider property inherited by one spouse as marital property when property was used for the common benefit of the marriage).
The husband further argues that the trial court erred in including in the marital estate more than 50% of his ownership interest in MIG because, he argues, that ownership interest is a “retirement benefit” within the meaning of Ala.Code 1975, § 30-2-51(b)(l). Alabama Code 1975, § 30-2-51(b), provides, in pertinent part:
*74 “The judge, at his or her discretion, may include in the estate of either spouse the present value of any future or current retirement benefits, that a spouse may have a vested interest in or may be receiving on the date the action for divorce is filed, provided that the following conditions are met:
[[Image here]]
“(3) The total amount of the retirement benefits payable to the non-covered spouse shall not exceed 50 percent of the retirement benefits that may be considered by the court.”
Both parties testified that they were depending on the husband’s ownership interest in MIG to support them in their retirement. In its judgment, the trial court stated that it was awarding the wife $400,00 “in contemplation of her retirement in the form of property division.” The parties’ and the trial court’s characterizations do not establish that the husband’s ownership interest in MIG constituted a “retirement benefit,” however. In Brasili v. Brasili, 827 So.2d 813 (Ala.Civ.App.2002), this court held that the determination of what constitutes a retirement benefit should be determined by the plain meaning of the term. This court has held that retirement benefits include military-retirement benefits; a state civil-service plan; private retirement plans, including individual retirement accounts, Keogh accounts, and annuities; qualified pension plans; profit-sharing retirement plans; and 401(k) accounts. 827 So.2d at 821 n. 8. In each case, the term “retirement benefits” refers to monetary benefits accessible only in the event of a retirement of one of the spouses. The plain meaning of “retirement benefits” cannot logically be expanded to include an ownership interest in a closely held business yielding income regardless of the employment status of the holding spouse, even if the parties agree that they planned to use that income for their support after both retired.
The husband argues that his ownership interest in MIG, described as a minority interest in a closely held family corporation that is not readily marketable, should not be considered marital property because, he says, that interest has never been titled in the wife’s name and because the wife did not materially contribute to the development of the business. Besides generally describing the properties of alimony in gross, the husband cites Ex parte Andrews, 24 So.3d 1091 (Ala.2009), in support of his argument. That decision was only a no-opinion denial of a petition for a writ of certiorari, with a concurring opinion by Justice Shaw and a dissenting opinion by Chief Justice Cobb. The denial of a petition for a writ of certiorari does not establish any binding legal authority as to the merits of the underlying appeal. Shepherd v. Summit Mgmt Co., 794 So.2d 1110, 1116 (Ala.Civ.App.2000). The husband also cites Buchanan v. Buchanan, 936 So.2d 1084, 1087 (Ala.Civ.App.2005), in support of his argument. That case does not, however, support the argument made by the husband that his ownership interest in MIG should be considered a part of his separate estate. Because the husband has failed to cite any relevant legal authority in support of his , argument, we do not consider this issue further. See Rule 28(a)(10), Ala. R.App. P.
The husband contends that the wife’s credit-card debt should not be included in the marital estate because, he says, the debt was incurred largely after the parties’ separation. We note, however, that the wife testified that the majority of the charges had been incurred during the parties’ marriage. Although the wife testified that she had charged some of her attorney’s fees to the credit cards, the trial court granted the husband a credit for *75 those charges against the amount he was ordered to pay in attorney’s fees. The parties presented no evidence indicating what, if any, other charges had been incurred during the separation. Therefore, we hold that the trial court did not commit any error on this point. See McCaskill v. McCaskill, 104 So.3d 186, 192 (Ala.Civ.App.2012) (noting that, without evidence indicating which charges were incurred after the separation, this court could not conclude that the credit-card debt was a part of the husband’s separate estate).
We conclude that the trial court did not err in classifying the Orange Beach house and the husband’s entire ownership interest in MIG as marital property or in classifying the wife’s credit-card debt as a marital debt.
B. Property Valuation and Division
After determining the property within the marital estate, a trial court must ascertain the value of that property, equitably divide the property, and implement a fair method for distributing the property. See Brothers v. Brothers, 623 So.2d 309 (Ala.Civ.App.1993). In this case, the husband does not raise any arguments regarding the valuation of the marital property, but he does argue that the trial court erred in dividing and distributing the property.
The husband first argues that the provisions in the trial court’s judgment awarding him his ownership interest in MIG “without any claim by the [w]ife,” but awarding the wife $400,000 “in property settlement, representing approximately 67% of the [h]usband’s 49% interest in [MIG],” conflict. We disagree with the husband. It is clear from the language of the divorce judgment, as amended, see, e.g., Hallman v. Hallman, 802 So.2d 1095, 1098 (Ala.Civ.App.2001) (“The words of a judgment are to be given their plain and ordinary meanings.”), that the trial court awarded the wife a monetary property settlement of $400,000 in lieu of an “in-kind” transfer of 67% of the husband’s ownership interest in MIG to the wife, which award was within its authority. See generally Grelier v. Grelier, 63 So.3d 668 (Ala.Civ.App.2010).
The husband next argues that the trial court erred in its award regarding the Fairhope house. In its judgment, the trial court ordered the husband to pay $30,000 toward necessary repairs to the Fairhope house. Steve Clifford Mears, a home inspector and licensed builder, testified that the Fairhope house needed between $60,000 and $70,000 in repairs. The husband testified that the parties had spent $27,500 in renovating and remodeling the Fairhope house during the marriage, but he did not specifically dispute that the house needed additional repairs, as Mears testified. The husband maintains, without citation to any legal authority, see Rule 28(a)(10), Ala. R.App. P., that the trial court should have credited the $27,500 the parties had previously paid against his $30,000 obligation. However, the trial court awarded the wife the $30,000 to cover necessary repairs for the Fairhope house based on its condition after the parties had already spent the $27,500 for improvements. No part of the $27,500 could be considered as partial payment of the $30,000; thus, we do not perceive how the husband can contend that he should have received a credit.
Throughout his brief, the husband argues that the trial court reached an inequitable property division because of the alleged errors addressed above. The husband does not specifically argue that the trial court awarded the wife an inequitably disproportionate share of the marital estate; thus, we do not delve into the value of the property each spouse re *76 ceived other than to generally say that we are convinced from at least one view of the evidence that the trial court equitably divided the marital property. See Avis Rent A Car Sys., Inc. v. Heilman, 876 So.2d 1111, 1124 n. 8 (Ala.2003) (“An argument not made on appeal is abandoned or waived.”). Having found that the trial court did not commit any error in classifying, valuing, or dividing the marital property, we reject the husband’s contention that the property division was inequitable. However, as discussed later in this opinion, we conclude that a mechanism used to distribute the property requires reconsideration.
C. The Wife’s Need for Alimony
In addition to its property award, the trial court awarded the wife $10,000 per month in periodic alimony. The husband attacks that award on the ground that the wife did not prove a need for periodic alimony.
Alabama Code 1975, § 30-2-51(a), provides, in pertinent part:
“If either spouse has no separate estate or if it is insufficient for the maintenance of a spouse, the judge, upon granting a divorce, at his or her discretion, may order to a spouse an allowance out of the estate of the other spouse, taking into consideration the value thereof and the condition of the spouse’s family.”
Based on that statute, “if the wife has no separate estate, or if she has such estate and it is insufficient for her maintenance, she is entitled to some allowance as permanent alimony.” Allen v. Allen, 223 Ala. 223, 225, 135 So. 169, 170 (1931). Thus, in order to receive alimony, a spouse must prove that he or she cannot maintain the marital standard of living based on his or her own property and income. Shewbart v. Shewbart, 64 So.3d 1080, 1087-89 (Ala.Civ.App.2010).
As a first step toward proving a need for periodic alimony, “a petitioning spouse should ... establish the standard and mode of living of the parties during the marriage and the nature of the financial costs to the parties of maintaining that station in life.” Shewbart, 64 So.3d at 1088. Although submitting an itemized monthly budget may be a preferred practice, nothing in the law requires a spouse to submit such a budget to the trial court in order to meet that evidentiary burden, as the husband contends. Because of the broad discretionary power of a trial court over an award of periodic alimony, see Shewbart, 64 So.3d at 1087, a petitioning spouse need only present sufficient evidence from which the trial court can reasonably infer the costs associated with the marital standard of living. See generally Grocholski v. Grocholski, 89 So.3d 123 (Ala.Civ.App.2011); 32 Am.Jur. Proof of Facts 2d 439, Spousal Support on Termination of Marriage (1982).
In this case, the record contains evidence indicating that, during the marriage, the parties enjoyed an upper-middle-class lifestyle in which they owned and maintained two substantial homes; purchased a rental property; accumulated over $50,000 in a checking account; often took vacations, sometimes out of the country; enjoyed memberships in a country club and yacht clubs; drove luxury automobiles; owned a boat worth over $100,000; and used a lawn-care service. The husband testified that, during the parties’ separation, he had kept close to the same lifestyle as he had during the marriage. After the parties separated, the husband purchased a Jeep sport-utility vehicle and a Mercedes automobile for his paramour to drive; took multiple vacations, including a trip to Jazz Fest, an eight-day trip to Hilton Head, South Carolina, a trip to Florida, a gambling trip to Biloxi, Mississippi, a golfing trip to Colorado, and a three-night trip to *77 Gatlinburg, Tennessee, where he had rented a house; and often ate dinner out at a cost of over $100 per meal.
The husband himself produced evidence as to many of the costs associated with maintaining the marital standard of living. That evidence shows that the parties had paid $4,243 per month for the mortgage, property taxes, insurance, and utilities on the Orange Beach house; $1,354 per month for the mortgage, property taxes, insurance, utilities, and lawn service on the Fairhope house; $3,081 per month for the mortgage, property taxes, management fees, and homeowners’ dues on the Fair-hope condo; and $1,700 to $1,900 per month for club costs. Factoring in costs for the parties’ automobiles, groceries, vacations, entertainment, clothing, and other ordinary living expenses, the trial court could have reasonably inferred that the parties regularly had spent close to $15,000 per month while married enjoying their comfortable station in life. The trial court also could have inferred that figure from the exhibit introduced by the husband detailing the postseparation expenditures of the parties.
In his brief to this court, the husband generally notes that the parties had substantially improved their lifestyle only in the last 9 years of their 23-year marriage. However, the trial court would not have erred if it based the periodic-alimony award on the standard of living the parties had established only later in their marriage.
“Obviously, during a lengthy marriage, a couple’s standard of living varies, particularly as one or both spouses progress in their careers and achieve higher earnings. In assessing the marital standard of living, a trial court should consider the period leading up to the divorce if that period accurately reflects the manner in which the parties would have been expected to live had they continued to be married. See generally Pickett v. Pickett, 723 So.2d 71 (Ala.Civ.App.1998) (plurality) (holding that wife, who had been primary wage earner for first 10 years of the parties’ marriage, had received inadequate alimony to sustain the luxurious standard of living established during the last 6 years of the marriage after husband became a physician).”
J.D.A. v. A.B.A., 142 So.3d 603, 620 (Ala.Civ.App.2013) (Moore, J., concurring in part, concurring in the result in part, and dissenting in part). The evidence in this case showed that the income of the husband had steadily increased during the last nine years of the parties’ marriage, so it could reasonably have been expected that the parties would continue to live as they had in the years leading up to the divorce, as the trial court concluded in its judgment.
After establishing the marital standard of living, the petitioning spouse must prove his or her financial inability to achieve that same standard of living independently. Shewbart, 64 So.3d at 1088. The evidence in the record shows that the wife, who was 63 years old at the time of the trial, had worked as an insurance agent during most of the years of the parties’ marriage, earning as much as $90,000 annually. The husband argues that the trial court should have factored in the wife’s wage-earning capacity when determining its periodic-alimony award. A trial court should consider the ability of a petitioning spouse to earn income when determining his or her need for periodic alimony. Id. In doing so, the trial court does not simply look back to determine how much the spouse had earned in the past but, instead, must consider the present circumstances of the spouse, including *78 his or her age, health, and employment prospects. Id.
In this case, the trial court received evidence indicating that the wife had “pretty much” retired before the husband told her he wanted a divorce and that she had performed only “a little part-time” work for approximately two years before that time. The wife testified that she has chronic obstructive pulmonary disease and “bad knees,” but, she said, her insurance position had not been strenuous and she could return to work if required. The wife maintained, however, that she should not have to readjust her mode of living to come out of retirement just because the husband had decided to divorce her, particularly in light of the fact that the husband was fully supporting his paramour, who was unemployed.
When assessing earning capacity for the purposes of periodic alimony, a trial court can consider that a spouse has retired. See, e.g., Thomas v. Thomas, 394 So.2d 372 (Ala.Civ.App.1980); and Jerrell v. Jerrell, 418 So.2d 157 (Ala.Civ.App.1982). Given further that the purpose of periodic alimony is to maintain the economic status quo between the parties, see Orr v. Orr, 374 So.2d 895, 897 (Ala.Civ.App.1979), a trial court would not necessarily exceed its discretion in basing periodic alimony on the employment situation and actual income of the parties as they existed at the time of their separation and divorce. In this particular case, the evidence shows that the wife did not retire because of the divorce but, rather, retired in good faith, as planned, without consideration for that unexpected eventuality. See Pierce v. Pierce, 455 Mass. 286, 297-98, 916 N.E.2d 330, 341 (2009) (discussing the effect of voluntary, good-faith retirement on periodic alimony). The trial court reasonably could have concluded that the wife’s good-faith retirement eliminated her ability to earn any future wages and that reducing any periodic-alimony award to account for the wife’s earning capacity would not be preserving the status quo, but altering it.
Furthermore, when deciding questions surrounding periodic alimony, a trial court can and should “consider whether the marriage, and its attendant standard of living, ended due to the greater fault of one of the parties, and, if so, the trial court can adjust the award accordingly.” Shewbart, 64 So.3d at 1089. As the husband admitted, the marriage ended due to no fault of the wife, but because he wanted a divorce in order to pursue a new relationship with another woman. The wife testified that she had been shocked and devastated when the husband had asked her for a divorce. Given those circumstances, the trial court reasonably could have determined that the wife should not have to return to work just because the status quo abruptly ended when the husband unilaterally and unexpectedly decided to end the marriage.
The wife testified that she receives approximately $1,600 per month in residual commissions from her former insurance sales, which amount she expects to decrease over time. Other than those commissions, the wife has no other income or income-producing assets. The commissions the wife was receiving at the time of the trial can cover the costs of the mortgage, taxes, insurance, utilities, and lawn service for the Fairhope house, but that amount would clearly be insufficient to cover the monthly costs associated with the Orange Beach house, which the parties agreed was far superior to the Fairhope house in location and amenities. The wife’s limited recurring income also could not cover her automobile costs, her country-club and yacht-club expenses, her vacation and entertainment costs, her credit-card pay *79 ments, and her other ordinary living expenses, such as food and clothing costs. The wife clearly showed a need for periodic alimony by proving that she could “routinely meet only part of the financial costs associated with maintaining the parties’ former marital standard of living.” Shewbart, 64 So.3d at 1088.
D. Ability to Pay
Once the financial need of the petitioning spouse is established, the trial court should consider the ability of the responding spouse to meet that need. Shewbart, 64 So.3d at 1088. “For purposes of determining a spouse’s ability to pay, and for purposes of calculating an appropriate amount of periodic alimony, the trial court should ordinarily use the spouse’s net income as the starting point for these evaluations.” Rieger v. Rieger, 147 So.3d 421, 431 (Ala.Civ.App.2013). In this case, the husband testified that he nets $15,000 per month in income from MIG. He argues on appeal that the trial court should have based any periodic-alimony award on that figure. However, the trial court received conflicting evidence on that point, including exhibits showing that the husband had stated that his gross annual income was $440,000, and that his gross monthly income amounted to a total of $30,866.66. The parties’ income-tax returns from 2011 also reflect an income figure in excess of $15,000 per month. The trial court did not expressly determine the amount of the husband’s net income, but we do not agree that it necessarily should have been limited to $15,000 per month as the husband contends. Nevertheless, as will be explained in more detail later in this opinion, in order to ascertain whether the husband has the ability to pay, we do require clarification from the trial court as to its determination of the monthly net income of the husband. See, e.g., Paulk v. Paulk, 97 So.3d 753 (Ala.Civ.App.2012) (remanding for trial court to clarify certain aspects of property division in order to assure meaningful appellate review).
“In considering the responding spouse’s ability to pay, the trial court should take into account all the financial obligations of the responding spouse, including those obligations created by the divorce judgment.” Shewbart, 64 So.3d at 1088. In the divorce judgment, fhe trial court ordered the husband to pay to the wife, within 30 days of the entry of the judgment,[2] $400,000 for her share of his ownership interest in MIG, over $35,000 for credit-card debt, $30,000 for repairs to the Fairhope house, $16,000 for her share of the parties’ checking account, and $10,000 for furniture.[3] The evidence in the record shows that the parties did not have any liquid assets at the time of the trial and that all of their real property was encumbered by substantial debt. In its amended judgment, the trial court implicitly acknowledged that the husband probably would not be able to readily pay the largest obligation imposed on him when it “reserved judgment in the mechanism by which [the husband] is to pay [the wife] the $400,000 awarded to [the wife] ... in the event that [the husband] cannot pay the amount awarded on or before the 90th *80 day following entry of the original [judgment].” [4]
From the evidence in the record, it is clear that the husband presently does not have liquid assets to pay the monetary amounts awarded in the property settlement. Moreover, the real estate awarded to the husband is encumbered by significant mortgage debt, limiting his ability to obtain a loan secured by those assets, and the liquidation value of the personal property awarded to the husband does not cover the amounts awarded to the wife. The husband testified that, at most, he could obtain a personal loan of $120,000. Although the trial court was not required to believe that testimony, the wife presented no counter-evidence establishing that the husband could access sufficient funds to timely pay the property settlement as ordered. In these circumstances, the lump-sum method of payment “appears sufficiently unfair that it amounts to an abuse of the trial court’s discretion.” Bailey v. Bailey, 954 P.2d 962, 966 (Wyo.1998).
“The disadvantage of a monetary award is that it can be used only where there are sufficient funds or liquid resources in the marital estate. If the amount of the desired award is greater than the resources available to pay it with, a monetary award is obviously not feasible.” 3 Brett R. Turner, Equitable Distribution of Property, § 9:9 (3d ed.2005).
“It is not error per se to make an award greater than the payor’s liquid assets, if the payor can sell or refinance property to meet the obligation.... Such an award is not ideal, however, for there are various disadvantages to compelling sale in the divorce case. Most importantly, sale requires payment of capital gains costs, commissions, and other expenses, and property often fails to earn full value when sold under the pressure of divorce- Because of these disadvantages, an immediate monetary award which exceeds the value of the payor’s liquid assets is a remedy of last rather than first resort.... A better option would be division in kind (if division can be accomplished without violating the rule against co-ownership), or a monetary award deferred over sufficient time for liquid funds to be accumulated without sale. If the payor cannot reasonably sell assets or borrow liquid funds to pay an immediate monetary award, the making of such an award is error.”
Id. (citations omitted). In this case, the trial court awarded the wife a lump sum of money after specifically rejecting as impracticable an in-kind division of the husband’s ownership interest in MIG. Thus, the only viable option, fair to both parties, would be to defer payment of the property-settlement award over time.
In Wells v. Wells, 428 So.2d 88 (Ala.Civ.App.1983), this court approved a plan, pursuant to which a trial court awarded a wife a share of her husband’s business, with the wife’s share being paid in equal annual installments spread out over 11 years, because requiring a large lump-sum payment would have forced the husband to liquidate the business. This court noted that the *81 installment plan preserved the business not only for the benefit of the husband, but also to assure future support for the wife and the parties’ child. 428 So.2d at 89. In Bailey, supra, the Wyoming Supreme Court held that an order requiring a lump-sum payment of $323,081.50, representing the wife’s interest in the husband’s closely held corporations, could not be fairly paid in a single lump sum. The court realized that the husband could possibly obtain a loan to cover the payment, but it held that “there seems to be little point in imposing that demand upon him and creating an interest drain to an outside entity when a fair payment schedule would provide for that interest to be paid to the wife.” 954 P.2d at 966. Thus, the court reversed the judgment and “remand[ed] the case for a hearing to determine an appropriate and reasonable payment schedule.” Id.
Like the Wyoming Supreme Court did in Bailey, we reverse that portion of the trial court’s judgment setting forth the mechanism pursuant to which the husband is to the pay the property settlement, and we remand the cause for the trial court to determine an appropriate and reasonable installment plan. The development of an installment plan for the payment of the property settlement most probably will impact the stream of income available to the husband for the payment of periodic alimony to the wife and for his own maintenance. This court has held that “[a] trial court should also consider the impact an award of periodic alimony will have on the financial condition of the responding spouse and his or her ability to maintain the parties’ former marital lifestyle for himself or herself.” Shewbart, 64 So.3d at 1088. Thus, on remand, the trial court must also consider whether the husband can fairly pay the periodic alimony as originally ordered while simultaneously paying the amounts due under the property settlement. Because of the husband’s adultery, the trial court determined that, between the parties, it should be the husband who should endure any diminution in the lifestyle of the parties. However, even in cases of marital misconduct, the alimony award should not be so oppressive as to leave “the parties in an unconscionably disparate financial position.” Shewbart, 64 So.3d at 1089. Alabama Code 1975, § 30-2-52, provides, in pertinent part, that “the misconduct of either spouse may be considered in determining the amount” of periodic alimony to be awarded, but the award still must be within the ability of the obligor spouse to pay on a consistent basis. Shewbart, 64 So.3d at 1088. Even in cases of flagrant infidelity, a trial court should not impose monetary obligations on the cheating spouse that will “financially cripple” him or her. See Wheeles v. Wheeles, 770 So.2d 635, 637 (Ala.Civ.App.2000) (reversing trial court’s judgment that required the husband to pay $1,150 in alimony because the judgment “cripple[d] him financially,” leaving him with $80 per month after his living expenses and court-ordered financial obligations, including periodic alimony, were deducted from “[h]is net income”). The trial court shall keep these guidelines in mind when formulating its property settlemeni/alimony plan.
As a first step, we believe the trial court should expressly ascertain the monthly net income available to the husband and then extrapolate from there the fair share of his disposable income that can be committed to the payment of the monetary awards in its judgment so as not to impose an undue economic hardship on the husband. Shewbart, 64 So.3d at 1088. We do not necessarily require the trial court to modify its individual awards, which we have found to be within its discretion, but our discussion should not be read as preventing the trial court from varying or deferring any of its individual awards to achieve a fair balance *82 in this case that meets its intent to provide the wife an equitable share of the marital property and appropriate periodic alimony within the means of the husband.
II. Postjudgment Amendment
The trial court entered its final judgment on November 25, 2013, which it amended on February 6, 2014. Following the amendment, the husband moved the trial court to set a supersedeas bond to stay the enforcement of the divorce judgment, as amended. The wife moved the trial court to deny that motion. On February 21, 2014, the trial court granted the motion to set a supersedeas bond conditioned on the husband’s accepting the reinstatement of a prior pendente lite order that, among other things, would require the husband to pay the wife’s credit-card expenses pending an appeal. The husband argues that the trial court did not have jurisdiction to enter that order because, he says, it had already entered a final judgment.
A trial court has jurisdiction to enter a temporary order of support during the pendency of an appeal. Segars v. Segars, 333 So.2d 155, 156 (Ala.Civ.App.1976) (citing Ex parte Taylor, 251 Ala. 387, 37 So.2d 656 (1948)). Although a trial court loses jurisdiction once an appeal is taken, it may still proceed in collateral matters that do not touch on any matter or question before the appellate court. Ex parte Taylor, supra. Temporary support pending appeal is considered a separate and collateral matter to the right to future support under the terms of the divorce judgment appealed. Segars, supra. Hence, we conclude that the trial court did not exceed its jurisdiction by ordering the husband to pay the wife temporary support in accordance with its pendente lite order once a stay of the divorce judgment took effect.
III. Attorney’s Fees
In the divorce judgment, the trial court ordered the husband to pay the wife’s attorney’s fees,[5] subject to a credit for any payments on the wife’s credit-card debt related to those fees. As we read the plain language of that provision, upon any payment of any part of the wife’s credit-card debt arising out of the attorney’s fees incurred in the underlying litigation, the husband will be credited with that payment, so he will not have to duplicate that payment to satisfy the divorce judgment. See Hallman, 802 So.2d at 1098 (“The words of a judgment are to be given their plain and ordinary meanings.”). Hence, we find no error in the wording of the judgment that would support a reversal of the attorney-fee award.

Conclusion

Based on the foregoing, we affirm the order of the trial court allowing the wife temporary support pending appeal and that part of the divorce judgment awarding the wife attorney’s fees. Although we find no error in the manner in which the trial court classified, valued, and divided the marital property, we reverse the divorce judgment insofar as it requires the husband to pay the largest monetary award in the property settlement in a lump sum. Because the division of property and the award of alimony must be considered together, see Pate v. Pate, 849 So.2d 972, 976 (Ala.Civ.App.2002), we also reverse that portion of the judgment awarding the wife $10,000 per month in periodic alimony *83 so that the trial court may reconsider its award in light of any modification of the judgment it makes to enable the husband to pay the property settlement. We remand this cause for further proceedings consistent with this opinion, including additional hearings, if deemed necessary in the discretion of the trial court.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P. J., and PITTMAN, THOMAS, and DONALDSON, JJ., concur.

. We note that the wife filed two motions seeking to hold the husband in contempt during the pendency of the action that were not expressly ruled upon. However, the tran *73 script of the trial indicates that there were pretrial hearings that were not transcribed and made available to this court. The parties did not present any evidence regarding the contempt issues at the trial. Thus, those issues appear to have been either resolved at the untranscribed pretrial hearings or abandoned at the trial. See, e.g., Morgan v. Morgan, [Ms. 2120101, July 11, 2014] - So.3d -, - (Ala.Civ.App.2014).

. The amended divorce judgment also provided that, if the Orange Beach house sold within a year, the wife would receive the lesser of $120,000 or 60% of the net proceeds of the sale. If the house did not sell within a year, the wife would receive $120,000.

. The husband states that the $16,000 and $10,000 awards should be reversed, but he does not make any legal argument in that regard, so we do not consider that issue. See Rule 28(a)(10), Ala. R.App. P.

. That provision does not affect the finality of the judgment because the trial court did not reserve the right to change its property division; rather, it retained jurisdiction solely over the enforcement of the property division. Compare Hubbard v. Hubbard, 935 So.2d 1191 (Ala.Civ.App.2006) (dismissing appeal from judgment in which trial court reserved right to modify property settlement), with TenEyck v. TenEyck, 885 So.2d 146 (Ala.Civ.App.2003) (treating as final a judgment in which trial court awarded a total of $500,000 alimony in gross payable in monthly installments, subject to the ability of trial court to modify amount of monthly installments).

. The husband also contends that the trial court erred in ordering him to pay the fees of a business appraiser amounting to $15,635. However, the husband does not make any legal argument with citation to authority that would support a reversal of the judgment for that alleged error. See Rule 28(a)(10), Ala. R.App. P.